# STATE OF MICHIGAN

# COURT OF APPEALS

In re HILLSBURG, Minors.

UNPUBLISHED
May 2, 2017

No. 331439
Muskegon Circuit Court
Family Division
LC No. 14-043326-NA

Before: MURPHY, P.J., and METER and RONAYNE KRAUSE, JJ.

PER CURIAM.

Respondent appeals as of right the January 15, 2016 order terminating her parental rights to her three minor children under MCL 712A.19b(3)(g). We affirm.

On appeal, respondent argues that petitioner, the Department of Health and Human Services (DHHS), failed to provide reasonable accommodations for her cognitive impairment. The DHHS must make reasonable efforts to reunite a child and a parent. MCL 712A.19a(2); *In re Hicks/Brown Minors*, 315 Mich App 251, 264; 890 NW2d 696 (2016). The Americans with Disabilities Act (ADA), 42 USC 12101 *et seq.*, requires public agencies, such as the DHHS, "to make reasonable accommodations for individuals with disabilities so that all persons may receive the benefits of public programs and services." *In re Terry*, 240 Mich App 14, 25; 610 NW2d 563 (2000). Reunification services and programs provided by the DHHS must comply with the ADA. *Id.* There is no conflict between the ADA and the juvenile code, MCL 712A.1 *et seq.*, because, under the juvenile code, a trial court must determine that reasonable efforts were made to rectify the conditions that led to its involvement in the case before entering an order of disposition. *Id.* at 25-26. The requirement that the DHHS "make reasonable efforts to reunite a family is consistent with the ADA's directive that disabilities be reasonably accommodated. In other words, if the [DHHS] fails to take into account the parents' limitations or disabilities and make any reasonable accommodations, then it cannot be found that reasonable efforts were made to reunite the family." *Id.* at 26.

A claim that the DHHS is not providing reasonable accommodations must be raised in a timely manner so that any reasonable accommodations can be made, and the failure to timely raise the claim constitutes a waiver. *Terry*, 240 Mich App at 26, n 5. The claim should be raised "when the court adopts a service plan, not at the time of a dispositional hearing to terminate parental rights." *Id.* at 26. However, a claim that the DHHS failed to provide reasonable accommodations is not necessarily waived if it is not raised at the time the case service plan was adopted. *In re Hicks/Brown Minors*, 315 Mich App at 269-271. In *In re Hicks/Brown Minors*,

the respondent made no objection regarding reasonable accommodations until more than a year and a half had passed since the adoption of the case service plan, but because the objection came 10 months before the supplemental petition to terminate parental rights was filed and almost a year before the termination hearing commenced, this Court held that the respondent's claim was not waived. *Id*.

Here, at the February 11, 2015 hearing, respondent expressed concern that she was not being provided services appropriate for her cognitive impairment. Two months later, in April 2015, the DHHS filed a petition to terminate respondent's parental rights. The termination hearing commenced in September 2015. Even though the length of time between respondent's objection and the termination proceedings was shorter than that in *In re Hicks/Brown Minors*, we conclude that respondent's claim that the DHHS failed to provide reasonable accommodations is not waived. Respondent expressed her concern about being provided appropriate services at a time when reasonable accommodations could have been made. See *In re Terry*, 240 Mich App at 26. No petition to terminate respondent's parental rights had yet been filed, much less was a termination hearing even scheduled. Although the DHHS requested at the February 11, 2015 hearing that the trial court change the goal of the proceedings from reunification to a concurrent goal of adoption and juvenile guardianship and the trial court granted the request, the trial court was not required to order the DHHS to initiate proceedings to terminate respondent's parental rights. Not only had the minor children not been under the care and supervision of the DHHS for 15 of the past 22 months, but the minor children were also being cared for by relatives. See MCL 712A.19a(6)(a).

This Court has clarified what the DHHS and the trial court "must do when faced with a parent with *a known or suspected* intellectual, cognitive, or developmental impairment":

> In such situations, neither the court nor the DHHS may sit back and wait for the parent to assert his or her right to reasonable accommodations. Rather, the DHHS must offer evaluations to determine the nature and extent of the parent's disability and to secure recommendations for tailoring necessary reunification services to the individual. The DHHS must then endeavor to locate agencies that can provide services geared toward assisting the parent to overcome obstacles to reunification. If no local agency catering to the needs of such individuals exists, the DHHS must ensure that the available service providers modify or adjust their programs to allow the parent an opportunity to benefit equal to that of a nondisabled parent. If it becomes clear that the parent will only be able to safely care for his or her children in a supportive environment, the DHHS must search for potential relatives or friends willing and able to provide a home for all. And if the DHHS shirks these duties, the circuit court must order compliance. Moreover, consistent with MCL 712A.19a(6), if there is a delay in providing the parent reasonably accommodated services or if the evidence supports that the parent could safely care for his or her children within a reasonable time given a reasonable extension of the services period, the court would not be required to order the filing of a termination period merely because the child has been in foster care for 15 out of the last 22 months.

We emphasize that these requirements are not intended to stymie child protective proceedings to the detriment of the children involved. However, "[t]he goal of reunification of the family must not be lost in the laudable attempt to make sure that children are not languishing in foster care while termination proceedings drag on and on." [*In re*] *Boursaw*, 239 Mich App [161,] 176-177[; 607 NW2d 408 (1999)]. In the event that reasonable accommodations are made but the parent fails to demonstrate sufficient benefit such that he or she can safely parent the child, then the court may proceed to termination. See *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012); *In re Gazella*, 264 Mich App 668, 676; 692 NW2d 708 (2005). If honest and careful evaluation reveals that no level or type of services could possibly remediate the parent to the point he or she could safely care for the child, termination need not be unnecessarily delayed. Yet, such assessment may not be based on stereotypes or assumptions or an unwillingness to make the required effort to accommodate the parent's needs. [*In re Hicks/Brown, Minors*, 315 Mich App at 282-283.]

The minor children were removed on January 23, 2014. Shortly thereafter, the DHHS knew, or should have suspected, that respondent had a cognitive impairment. In the initial service plan, the foster-care worker wrote that she easily noted that respondent, who had reported to have developmental delays, had cognitive delays. Unlike *In re Hicks/Brown* where the DHHS did not order psychological testing for 16 months, the DHHS in this case did not delay in getting an evaluation of respondent. In the parent-agency agreement, which respondent signed on March 7, 2014, respondent agreed to complete a psychological evaluation with Dr. Joseph Auffrey for an assessment of her mental health and intellectual needs, and she underwent the evaluation on March 24, 2014.

The report was admitted into the record at the June 2, 2014 review hearing, which was the second review hearing out of what would ultimately be seven review hearings before the jury trial and a total of nine review hearings before termination was ordered. The report from Dr. Auffrey was grim regarding respondent's ability to parent. Dr. Auffrey stated that respondent functioned as a 12-year-old child and that her deficient intelligence rendered her slow and ineffective in problem solving and that she would have great difficulty in maintaining a safe and nurturing daily environment for the children. Dr. Auffrey believed that respondent could only safely parent if she was consistently accompanied by a fully established and sufficient parent figure. Dr. Auffrey recommended that respondent be involved in a long-term parent-mentor program with frequent and random interventions, and that even with participation in such a program, respondent's risk to her child would only be reduced, not eliminated. And, for the foreseeable future, respondent required daily hands-on assistance. "The [Americans with Disabilities Act (ADA)] does not require petitioner to provide respondent with full-time, live-in assistance with her children," In re Terry, 240 Mich App at 27-28, which, effectively, is what would have been required vis-à-vis Dr. Auffrey's recommendation. The DHHS is required to make reasonable efforts to reunify a family, not extraordinary efforts, and it is unreasonable to expect the DHHS to find a program, much less the funding for such a program, that would provide the type of long term, high intervention, hands-on assistance recommended by Dr. Auffrey.

However, petitioner was offered many services designed to reduce reunification barriers, keeping in mind her issues. In addition to parenting classes through Love, Inc., respondent was assigned a parent mentor. The parent mentor testified that she met with respondent twice a week. One day, she supervised a parenting time visit; the other day, she went over any concerns that she had with respondent. In addition to working with respondent on parenting skills, the parent mentor also aided the respondent with communication, housing, and employment. An Infant Mental Health therapist also worked with respondent on her parenting skills. The therapist went to respondent's parenting time visits about twice a month.[1] She discussed and modeled appropriate interaction for respondent. Both the parent mentor and the therapist knew of respondent's cognitive impairment.[2]

In September 2014, in a phone call, because of respondent's lack of comprehension, the foster care worker and the therapist discussed different approaches for working with respondent. The therapist agreed to help respondent obtain her special education records in an effort to find ways to assist respondent in learning. The records were obtained. The records showed that respondent was cognitively impaired with low reading skills. She had an IQ between 58 and 62, which put her cognitive abilities at the extremely low range with possible mild mental retardation. The records also showed that respondent did better in comprehending visual information and that her short-term memory was extremely low. According to the DHHS, respondent's school records showed that there was a "definite cognitive impairment." The parent mentor was given a copy of the records, and she told the foster-care worker that she would redevelop some of her strategies in working with respondent.

Additionally, we note that respondent was not always compliant with services. A parent has a responsibility to participate in services that are offered, *In re Frey*, 297 Mich App at 248, but mere participation is not enough, *In re Gazella*, 264 Mich App at 676. "[I]t is not enough to merely go through the motions; a parent must benefit from the services offered so that he or she can improve parenting skills to the point where the children would no longer be at risk in the parent's custody." *Id.* "In the event that reasonable accommodations are made but the parent fails to demonstrate sufficient benefit such that he or she can safely parent the child, then the court may proceed to termination." *In re Hicks/Brown, Minors*, 315 Mich App at 283. The record showed that despite numerous attempts to coach the respondent on how to appropriately and effectively engage with her children during supervised parenting time, respondent would instead ignore the children, or if she was taking care of one child, was unable to supervise the

---

[1] It should also be noted that during the pendency of this case, respondent was never denied parenting time with her children, unlike in In re Hicks/Brown, where respondent was denied any parenting time, supervised or otherwise, with her child for more than 8 months.

[2] In early 2015, respondent started receiving some services at Developmental Disability Services. Respondent was assigned a counselor. Respondent was also assigned a supports coordinator, who assisted respondent in her search for housing. The supports coordinator also discussed parenting time visits with respondent and attended some of respondent's parenting time visits.

other children. When respondent would receive feedback on her performance, she would become defensive and shut down, never implementing the advice given to her by service providers.

Despite the parent-mentors ability to help with acquisition of proper housing, as well as transportation, respondent never followed through and was still living in unsuitable housing at the time of termination. Respondent would not disclose to DHHS where or with whom she was living, citing her host's privacy as a reason for the nondisclosure. "If it becomes clear that the parent will only be able to safely care for his or her children in a supportive environment, the DHHS must search for potential relatives or friends willing and able to provide a home for all." *Id*. The type of supportive environment the respondent needed in order to potentially achieve reunification existed with her parents, who were caring for the children during the pendency of this termination process. However, the grandparents testified that they were willing to adopt the children and that having respondent be part of that family unit was not desirable, as respondent has boundary issues with the grandparents regarding their care of the children. The children received "incredible" care from their grandparents, and were not noted to exhibit behavioral outburst as they did after parenting time with respondent.

"After [a parent's] children have come within the jurisdiction of the family court, a parent, whether disabled or not, must demonstrate that she can meet their basic needs before they will be returned to her care." *In re Terry*, 240 Mich App at 28. "If a parent cannot or will not meet her irreducible minimum parental responsibilities, the needs of the child must prevail over the needs of the parent." *Id*, quoting *In re AP*, 1999 Pa Super 78; 728 A2d 378, 379 (1999). The trial court found that the respondent, despite all reasonable efforts made for reunification, was never going to get anything more than supervised parenting time with her children. Although family placement usually weighs strongly against termination, the facts and circumstances in this case allowed the court to reach the conclusion that termination was in the best interests of the children in this case, and we cannot find clear error in this determination.[3]

For the reasons stated above, we affirm.

/s/ William B. Murphy
/s/ Patrick M. Meter
/s/ Amy Ronayne Krause

---

[3] This court "review[s] for clear error . . . the court's decision regarding the child's best interests." *In re JK*, 468 Mich 202, 209; 661 NW2d 216 (2003).